UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BRANTON A. NOOJIN,

    Plaintiff,

    v.                                                           CAUSE NO. 3:24-CV-924 DRL-JEM

BRIAN ENGLISH *et al.*,

    Defendants.

OPINION AND ORDER

Branton A. Noojin, a prisoner without a lawyer, filed a motion to amend his amended complaint. ECF 24. At this stage, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). When justice requires it, leave should be freely given. *Id.* Mr. Noojin has attached a proposed second amended complaint to his motion. In the interests of justice, the court will grant the motion and proceed to analyze his second amended complaint.

Under 28 U.S.C. § 1915A, the court must screen a prisoner's complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Mr. Noojin

is proceeding without counsel, his allegations must be given liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Mr. Noojin's second amended complaint is thirty pages long and describes various medical issues he has experienced at the Miami Correctional Facility (MCF) since February 2, 2022. He has sued Warden Brian English, Doctor Carl Kuenzli, Grievance Specialist Michael Gapski, Medical Director (HSA) Leeann Ivers, and Centurion Medical Group, LLC, for $700,000.00 in compensatory and punitive damages. He also tries to seek declaratory relief.

    A. *Eighth Amendment Deliberate Indifference – Individual Medical Claims.*

Inmates are entitled to constitutionally adequate medical care for serious medical conditions. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). To establish liability under the Eighth Amendment, a prisoner must show (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a

2

substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-98. Put another way, inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

Accordingly, deference must be given "to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotations omitted). This standard "reflects the reality that there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and quotations omitted). Additionally, it is not enough that a medical professional be

3

mistaken in his or her judgment. As noted, the deliberate indifference standard requires a something "akin to criminal recklessness," *Thomas*, 2 F.4th at 722, rather than "negligence, gross negligence, or even recklessness," *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Ignoring an inmate's complaints of pain or delaying necessary treatment can amount to deliberate indifference, particularly when the delay "exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations and quotations omitted).

With regard to non-medical prison officials, they generally don't violate the Constitution it they "reasonably relied on the judgment of medical personnel." *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) (quoting *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)). Though prison officials are "presumptively entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care[,]" they may not ignore a prisoner's complaints entirely or refuse to act if they know the medical staff is failing to treat the prisoner. *Id*. (quotations and citations omitted). That said, "an official's mere negligence in failing to detect and prevent subordinates misconduct is not [enough]." *Id*. (cleaned up).

    1. *Inguinal Hernia.*

Mr. Noojin claims he began having pain in his abdomen, testicles, and groin beginning on February 2, 2022. After filing several healthcare requests, he was evaluated on August 9, 2022. It was noted he had a "lump on groin above testicles" which "pops out when laughing or activity," but no tests were done. ECF 24-1 at 3. Mr. Noojin filed several more healthcare requests claiming he had a hernia and was in pain, but nothing

4

was done. On December 14, 2022, he received a response that a hernia belt had been ordered by Dr. Carl Kuenzli. However, he didn't receive the hernia belt until April 10, 2023. Mr. Noojin believes he should have been "scheduled for a consultation for hernia surgery" in December instead of being given the belt. *Id*. at 4.

Mr. Noojin filed his fifth healthcare request on April 21, 2023, stating, "My hernia is getting worse. I'm in pain I can't do anything. I can't exercise. It's messing up my quality of life. I need surgery." *Id*. at 9. He claims the hernia belt, which he had received earlier that month, was "no help at all." *Id*. at 10. In fact, he alleges the hernia belt made the pain worse. He eventually learned the "technique" to push his intestines back through the tear, which helped but was a painful process. *Id*. He was "referred to the doctor," but nothing was done. *Id*. On April 27, 2023, he filed another healthcare request stating, "Hernia so bad opening so big guts pop through with ease. This shit hurts so bad it's destroying my everyday way of life. I need surgery now." *Id*. at 13. On June 27, 2023, and July 25, 2023, he filed additional healthcare requests indicating he was in worsening pain and that the hernia belt did not work.[1] He received a response indicating he had been "referred to provider waiting on doctor's sick call." *Id*. at 14.

In late August or early September 2023—almost eighteen months after Mr. Noojin began complaining of a hernia—Dr. Kuenzli attempted to schedule Mr. Noojin for a surgical consultation. However, "the provider [Centurion] cancelled the consultation to see a surgeon in place of an ultimate treatment plan. An ultrasound." *Id*. He received two

---

[1] He indicates the hernia belt was left in property when he was transferred to segregation, but he claims it didn't work anyway.

5

ultrasounds in October, which both indicated "herniation is demonstrated." *Id*. at 15. Nothing else was done at that time, and he did not receive any pain medication. Mr. Noojin sent an additional grievance about the matter, but he didn't receive a response until almost six months later.

On November 23, 2023, Mr. Noojin filed another healthcare request asking for a "second surgery consultation" because he was still in pain. *Id*. at 18. He was scheduled for triage and given "stress management." *Id*. at 19. On December 30, 2023, his consultation for hernia surgery repair was approved, and he met with the outside surgeon, Dr. Brumfield, who scheduled him for surgery "right away." *Id*. On March 12, 2024, Mr. Noojin underwent hernia surgery. He blames the additional seven-month delay on "Centurion the provider alone" because they allegedly wanted to "save money for as long as possible." *Id*.

Following the surgery, Mr. Noojin filed additional healthcare requests on March 22, 2024 and March 26, 2024, because he believed something had gone wrong with his surgery. He noted that his intestines and testicles were swollen, that his incision site was numb, and that he was in pain. He received a response indicating an ultrasound had been ordered and that he had seen the provider. On April 14, 2024, Mr. Noojin filed another healthcare request inquiring about the ultrasound and a surgical follow-up. He was seen by Dr. Brumfield on April 17, 2024, who noted that Mr. Noojin was healing well but had some swelling, so he ordered an "athletic supporter." *Id*. at 20. It took Centurion until July 5, 2024—three months later—to provide Mr. Noojin with the athletic supporter. He was in pain during this time and could not exercise.

6

Based on these allegations, Mr. Noojin claims Dr. Kuenzli violated the Eighth Amendment because he knew about yet failed to adequately treat his hernia from approximately February 2, 2022, until he recommended the surgical consult (which was ultimately denied by Centurion) in late August or early September 2023. He claims Dr. Kuenzli refused to provide any relief for his worsening pain and instead insisted on an ineffective course of treatment with the hernia belt. Although it's clear Dr. Kuenzli provided Mr. Noojin with some care during that time, giving Mr. Noojin the benefit of the inferences to which he is entitled at this stage, he has stated a plausible claim against Dr. Kuenzli. *See, e.g., Goodloe*, 947 F.3d at 1031 (medical professionals may be liable if they ignore pain or delay necessary treatment); *see also Sanders v. Moss*, 153 F.4th 557, 568 (7th Cir. 2025) (deliberate indifference may be established "a prison official persists in a course of treatment known to be ineffective") (quoting *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016), *as amended* (Aug. 25, 2016)). He believes HSA Leeann Ivers is also liable because he submitted at least eight pre-surgical healthcare requests about his hernia, yet she failed to assist him in any way. Though supervisory liability alone is insufficient to state a claim, the court will give Mr. Noojin the benefit of the inferences to which he is entitled at this early stage and infer that—through those multiple healthcare requests and in her role as a medical administrator—HSA Ivers knew of Mr. Noojin's hernia issues but turned a blind eye to his needs. *See Ollison v. Gossett*, 136 F.4th 729, 736 (7th Cir. 2025) ("supervisory official must have known of, facilitated, approved, condoned, or turned a blind eye to his subordinates' activity, although [s]he need not have directly participated"). Thus, Mr.

Noojin will be permitted to proceed against Dr. Kuenzli and HSA Ivers on Eighth Amendment claims related to his hernia.[2]

With regard to the remaining individual defendants, however, Mr. Noojin's claims don't fare as well. He believes Warden English violated the Eighth Amendment because he is "responsible for my unnecessary and wanton infliction of pain, because I must rely on prison authorities to treat my medical issues. . . . [H]e is the ultimate hiring and firing authority at this facility." ECF 24-1 at 4. This is insufficient to state a claim. *See Moderson v. City of Neenah*, 137 F.4th 611, 617 (7th Cir. 2025) ("A defendant cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation.") (citation omitted)); *Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017) ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (no general *respondeat superior* liability under 42 U.S.C. § 1983). Mr. Noojin also states generally, "all were aware I had a serious medical issue, because I wrote them and told them." ECF 24-1 at 11. However, other than submitting grievances and attempting to appeal them, he doesn't provide any details to support this conclusory allegation. In fact, by the time Mr. Noojin filed his first grievance, on February 16, 2023—nearly a year after the hernia was first discovered—he admits a

---

[2] Mr. Noojin doesn't plausibly suggest, however, that Dr. Kuenzli or HSA Ivers were responsible for his allegedly deficient post-surgical care, as he doesn't mention them with regard to those allegations. In fact, as will be discussed further below, Mr. Noojin states "Centurion Medical Group LLC – the provider is solely responsible for th[e] deliberate indifference" subsequent to Dr. Kuenzli's first referral to the surgeon in late August/early September of 2023. ECF 24-1 at 15; *see also id*. at 19 ("Centurion the provider alone is responsible for my pain and suffering. I suffered seven (7) extra months because of their wanton neglect, deliberate indifference, and malicious conduct."); *see also id*. at 21 ("Centurion is responsible for the deliberate indifference and wanton neglect which cause me three extra months of pain.").

8

hernia belt had already been ordered for him by Dr. Kuenzli. Although he didn't receive the hernia belt for another two months, it's clear he was already being evaluated for the hernia by medical personnel at that time. When he filed his second grievance about the hernia on April 17, 2023, claiming that "nothing had been done to fix it," he admitted in that same grievance that he had received the hernia belt. ECF 24-1 at 11. A third grievance was filed on September 2, 2023, which demanded that he be seen by a surgeon, but the grievance itself acknowledged that when he was last seen by medical the week before, "I was referred to a surgeon." *Id*. at 16. Again, while it's clear Mr. Noojin disagreed with that course of treatment and instead wanted surgery immediately, he hasn't plausibly alleged that the Warden or Grievance Specialist Gapski were deliberately indifferent to his medical needs. *See Eagan*, 987 F.3d at 694 (non-medical prison officials generally don't violate the Constitution as long as they reasonably relied on judgment of medical personnel); *see also Walker*, 940 F.3d at 965 (inmates aren't entitled to demand specific care and deference must be given to medical professionals' treatment decisions). These allegations fail to state any claims.

Mr. Noojin also faults the Warden and Grievance Specialist Gapski for failing to process his grievances in a timely or proper manner. He believes that "by not responding to my grievance the grievance specialist violated my constitutional rights." ECF 24-1 at 6. He claims the "grievance process is unavailable at this facility" and that both Warden English and Grievance Specialist Gapski are "responsible for the grievance process not being available to me." *Id*. at 8–9. These allegations aren't sufficient to state a constitutional claim either. *See Grieveson v. Anderson*, 538 F.3d 763, 770 (7th Cir. 2008)

9

(noting there is not a Fourteenth Amendment substantive due process right to an inmate grievance procedure); *see also Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (observing that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations"); *Conner v. Hoem*, 768 Fed. Appx. 560, 564 (7th Cir. 2019) ("In any case, the Constitution does not require state actors to enforce their own policies and regulations.") (citing *Garcia v. Kankakee Cty. Hous. Auth.*, 279 F.3d 532, 535 (7th Cir. 2002)).

    2. *Kidney Issues.*

Mr. Noojin also complains about issues with his kidneys. He filed healthcare requests on November 21, 2021 and August 9, 2022 about his preexisting kidney problems, dark urine, and a suspected urinary tract infection. He was referred to sick call, but nothing else was done.[3] In September 2023, he was seen by Dr. Kuenzli and explained to him that he was having to urinate up to fifteen times per night and thirty times during the day. His bladder was irritated and his urethra burned. Dr. Kuenzli ordered Flomax to help Mr. Noojin's urination problems, but it did not help. On August 1, 2024,[4] Mr. Noojin filed a healthcare request stating:

> My surgeon ordered me tests for why I urinate almost 30 times a day. I then seen (sic) Nurse Practitioner 'Kathy' after my trip to the surgeon. She ordered several tests to find out why my bladder is irritated. Why I urinate so frequently. It's an issue. I seen (sic) her at chronic care several weeks earlier. Still no tests conducted after several weeks.

---

[3] He doesn't provide any additional details about symptoms or other complaints in the nine months between these dates.

[4] Again, although he says "all signs and symptoms remained," he doesn't provide any additional details about this one year gap in the record.

10

ECF 24-1 at 22. A week later, he filed a grievance about the matter. The grievance was stamped "received" on August 13, 2024, and he "gave blood and urine" that same day. *Id*. Mr. Noojin claims that although he had been having urinary issued for over two years, he started "getting antibiotics out of the blue" after the August 13 blood draw. *Id*. He claims a doctor (he doesn't say which doctor) didn't tell him he had a urinary tract infection, and he had to "figure[] this out on my own." *Id*. He claims he was on the antibiotics for five months, but that some days he didn't receive them. He saw the doctor (again, he doesn't say who) twice during this period. The tip of his penis burned and leaked, and he couldn't sleep. On January 14, 2025, he filed a healthcare request stating he was "still having major issues urinating" and had urinated blood. *Id*. at 23. He admitted in that healthcare request that labs had been ordered and collected. On February 7, 2025, he filed a second grievance noting that he had been given Flomax in September of 2023, that he received the "proper tests several months ago," and had "been on three antibiotic regiments so far—a fourth now." *Id*. at 26. On February 9, 2025, Mr. Noojin submitted a healthcare request regarding the "mental anguish" and fatigue he was experiencing. *Id*. at 23. He was given "stress management exercises" to do. *Id*. On April 8, 2025, he saw Dr. Kuenzli for a chronic care visit. He explained that he was still having urinary issues. Dr. Kuenzli recommended that he see a "urine specialist." *Id*. at 27. Instead, he was directed to submit a urinalysis. Mr. Noojin states, "[n]o doubt the provider cancelled the trip to the urine specialist and gave me a urinalysis instead as alternate treatment." *Id*. Eight days later he was prescribed another round of antibiotics. Dr. Kuenzli also ordered additional tests to "see if there is blood in my stool." *Id*. at 28.

When Mr. Noojin filed his amended complaint less than a month later, the tests still hadn't been performed. He claims that all of the defendants are "responsible for the inadequate medical care I am receiving in regards to my urinary track (sic) infection for two plus years." *Id*. at 23. He claims they are "doing absolutely nothing" to determine the cause of his issues. *Id*. He speculates that his treatment will be "prolonged as long as possible." *Id*.

These allegations fail to state claims against any of the individual defendants. When Mr. Noojin first brought the issue directly to Dr. Kuenzli's attention, he was almost immediately prescribed Flomax. After a year gap—for which Mr. Noojin provides no information—a different provider ordered blood tests that were collected within two weeks of Mr. Noojin filing a grievance. He was then prescribed antibiotics. When he filed another grievance several months later for continued symptoms, additional tests were ordered. Although Mr. Noojin speculates he won't receive a diagnosis or additional treatment in a timely manner, such a claim can't plausibly be inferred based on the current record considering it's clear he received medical care from the defendants when his concerns were raised. *See, e.g., Walker*, 940 F.3d at 965 (inmates aren't entitled to demand specific care); *Jackson*, 541 F.3d at 697–98 (medical professionals aren't required to provide "proper" treatment and their decisions are given deference because there isn't one single way to practice medicine); *Eagan*, 987 F.3d at 694 (non-medical prison officials generally don't violate the Constitution as long as they reasonably relied on judgment of medical personnel); *see also Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir.

2009) (claim must be plausible on its face and complaint must provide adequate factual content).

Mr. Noojin also takes issue with the grievance process. He claims his due process rights were violated "because the grievance specialist and L. Ivers did not respond to my grievance in 10 business days as is policy," that the failure to respond constituted cruel and unusual punishment, and that "Brian English, Michael Gapski, and Leeann Ivers are responsible for these civil rights violations." *Id*. at 25–26. These allegations are insufficient to state a constitutional claim. *See Grieveson*, 538 F.3d at 770 (there is no Fourteenth Amendment substantive due process right to an inmate grievance procedure); *see also Scott*, 346 F.3d at 760 ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations"); *Conner*, 768 Fed. Appx. at 564 ("In any case, the Constitution does not require state actors to enforce their own policies and regulations."). The individual claims regarding Mr. Noojin's alleged kidney/urination issues will be dismissed.

      3. *Dry Skin.*

Mr. Noojin claims "Minerin cream" was ordered for his extremely dry skin on January 23, 2024. When he hadn't received the cream several months later, he filed grievances about the matter. On August 9, 2024, he filed another grievance, which was "finally resolved" the month before he filed his amended complaint. ECF 24-1 at 29. He states the grievance was denied even though "I have only got this prescription twice." *Id*. at 30. He claims "all defendants are responsible" for not providing him with adequate medical treatment. *Id*. He also blames Grievance Specialist Gapski and Warden English

13

because "the grievance process is unavailable at this facility" and nothing has been done to correct it. *Id*.

These sparse allegations are insufficient to state a plausible claim, especially considering he admits he was prescribed cream by Dr. Kuenzli in response to his dry skin concerns and received it twice during the relevant period. *See, e.g., Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.") (quotations and brackets omitted)); *Bissessur*, 581 F.3d at 602 (claim must be plausible on its face and complaint must provide adequate factual content); *see also Grieveson*, 538 F.3d at 770 (there is no Fourteenth Amendment substantive due process right to an inmate grievance procedure). The claims regarding Mr. Noojin's dry skin issues will be dismissed.

B. *Eighth Amendment – Monell Claims.*

Finally, Mr. Noojin has sued Centurion Medical Group, LLC, a private company contracted with the Indiana Department of Correction to provide medical care to inmates housed at MCF. There is no *respondeat superior* liability under 42 U.S.C. § 1983, and a private company can't be held liable for damages simply because it employed a medical professional who engaged in wrongdoing. *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020). A private company performing a public function can, however, be sued under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), but only if the "unconstitutional acts of their employees . . . were carried out pursuant to an official custom or policy." *Grieveson*, 538 F.3d at 771 (citations omitted). The purpose of this

requirement is to "distinguish between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). To allege a viable *Monell* policy claim, the plaintiff must identify an official policy that caused him injury. *Grieveson*, 538 F.3d at 771. Alternatively, a plaintiff pursuing an official custom or practice theory "must allege facts that permit the reasonable inference that the practice is so widespread so as to constitute a governmental custom." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

Here, throughout his second amended complaint, Mr. Noojin claims it is the practice of Centurion to "intentionally delay, deny, or interfere (sic) with treatment to save money." ECF 24-1 at 4. In support of this contention, he claims Centurion (1) delayed providing him with his medically prescribed hernia belt for four months, (2) cancelled the surgical consultation recommended by Dr. Kuenzli and instead sent Mr. Noojin for a less expensive ultrasound even though surgery was allegedly necessary, (3) delayed the surgical consultation for an additional seven months even after the ultrasound showed the presence of a hernia, (4) failed to provide him with a prescribed post-surgical athletic supporter for three months, (5) disregarded Dr. Kuenzli's recommendation to see a urinary specialist, and (6) refused to provide cream prescribed for his dry skin in a timely and consistent manner. Giving Mr. Noojin's allegations the benefit of the inferences to which they are entitled at this early stage of the litigation, it may be inferred that Centurion repeatedly disregarded reasonable medical treatment decisions regarding Mr. Noojin's care solely for the purpose of saving money. Accordingly, he will be granted leave to proceed against Centurion on a *Monell* claim. *See Roe v. Elyea*, 631 F.3d 843, 863

15

(7th Cir. 2011) ("administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions" but not when made "*to the exclusion of reasonable medical judgment* about inmate health"); *Sanders*, 153 F.4th at 570 ("plaintiff may be able to demonstrate the existence of an official policy or custom by presenting evidence limited to his own experience" but those acts must be "persistent and widespread as to practically have the force of law") (quotations and citations omitted)).

For these reasons, the court:

(1) GRANTS the motion to amend (ECF 24);

(2) DIRECTS the clerk to separately docket ECF 24-1 as the second amended complaint;

(3) GRANTS Branton Noojin leave to proceed against Doctor Carl Kuenzli and Medical Director (HSA) Leeann Ivers in their individual capacities for compensatory and punitive damages for denying him constitutionally adequate medical care for his inguinal hernia in violation of the Eighth Amendment from February 2, 2022, until late August or early September 2023;

(4) GRANTS Branton Noojin leave to proceed against Centurion Medical Group, LLC, on a *Monell* claim for having a custom or practice of intentionally delaying, denying, or interfering with his medical treatment to save money;

(5) DISMISSES all other claims;

(6) DISMISSES Warden Brian English and Grievance Specialist Michael Gapski;

(7) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service

16

from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Doctor Carl Kuenzli, Medical Director (HSA) Leeann Ivers, and Centurion Medical Group, LLC, at Centurion Health Service with a copy of this order and the second amended complaint (ECF 24-1) pursuant to 28 U.S.C. § 1915(d);

(8) ORDERS Centurion Health Service to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information; and

(9) ORDERS, under 42 U.S.C. § 1997e(g)(2), Doctor Carl Kuenzli, Medical Director (HSA) Leeann Ivers, and Centurion Medical Group, LLC, to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED.

February 6, 2026

*s/ Damon R. Leichty*
Judge, United States District Court